## THE QUEEN OF THE PACIFIC.

BANCROFT-WHITNEY CO. et al. v. THE QUEEN OF THE PACIFIC.

(District Court, N. D. California.   May 12, 1896.)

No. 10,301.

1. SHIPPING—DAMAGE TO CARGO—LIMITATION OF SUIT BY BILL OF LADING.
   A provision in the shipping receipts that all claims against "the steamship company or any of its stockholders" for damage to goods must be presented within 30 days from the date thereof, as a condition precedent to maintaining a suit against such company or stockholders, does not apply to a suit in rem against the ship.

2. SAME—PUBLIC POLICY.
   A limitation in shipping receipts of 30 days from the date thereof for bringing suit for damage to goods, if applicable to proceedings in rem against the vessel, is unreasonably short, and therefore void, as against public policy.   The Queen of the Pacific, 61 Fed. 213, followed.

3. SAME—DAMAGE TO GOODS BY SEA WATER—BURDEN OF PROOF.
   The mere fact that goods are damaged by sea water entering the ship does not create a presumption of damage by a peril of the seas, even when aided by the presumption of seaworthiness, for the vessel may have been seaworthy, and the water still have got in through negligence.   Hence, the introduction of the shipping receipts, which are prima facie evidence of shipment of the goods in good condition, together with proof that the goods were never delivered, but were brought back to the port of shipment in a damaged condition by reason of being wet with sea water, is sufficient to shift the burden of proof to the defendant.

4. SAME—PRESUMPTION OF SEAWORTHINESS—REBUTTAL BY FACT OF LEAKING.
   A steamer, alleged by her claimants to have been staunch, strong, and seaworthy, and fully manned, officered, and equipped, was discovered, after being only 11 hours at sea, in fair weather, to have a list, due to sea water in her between-decks.   The water increased so rapidly that a few hours later it was decided to run for a harbor of refuge, where the ship was at once beached to prevent foundering.   Held, in an action for damage to cargo, that these facts, if not sufficient to raise a presumption of unseaworthiness, were at least sufficient to throw the burden on the carrier to show wherein and how the leak arose.

This was a libel in rem by the Bancroft-Whitney Company and others against the steamship Queen of the Pacific (the Pacific Coast Steamship Company, claimant) to recover for damage to goods shipped on the steamship by libelants.   The case was heard on motion by the claimant for judgment in its favor, after the libelants had rested their case.

Geo. W. Towle, for the motion.

Andros & Frank, opposed.

MORROW, District Judge.   This case coming on for hearing, and the libelants having rested their case, proctor for claimant moved the court for judgment in his favor on several grounds, which are as follows:   (1) That the testimony does not show that the steamship was within the Northern district of California when the libel was filed; (2) that there is no testimony that claims for the damages complained of to the goods shipped on board the Queen of the Pacific were filed or presented to the steamship company within 30 days from the date of the shipping receipts, in compliance with

the stipulation to that effect contained in the receipts; and (3) that there is no testimony tending to show that the damage complained of was occasioned by the negligence of the carrier.

Taking these questions up in their order, and very briefly, it may be said that I do not think the first point is well taken. There is testimony tending to establish that the steamship was within the jurisdiction of the court when the libel was filed.

The second point was disposed of on the exceptions heretofore raised to the sufficiency of the allegations of the libel. I then held that a provision in the shipping receipts that all claims against the steamship company or any of its stockholders for damage to the goods must be presented within 30 days from the date thereof, as a condition precedent to maintaining a suit against such company or its stockholders, did not cover or affect the right to maintain a suit in rem against the ship; and I held, further, that the period of 30 days, assuming that such provision did apply to proceedings in rem against the vessel, was unreasonably short, and therefore void, as against public policy. See The Queen of the Pacific, 61 Fed. 213, 217. This, therefore, must be accepted as the law of the case.

With respect to the third point, the averments of the libel and the denials and admissions and averments of the answer are important. The libel alleges that the goods claimed to have been damaged were shipped in good order and condition on board the steamship Queen of the Pacific, at the port of San Francisco, for transportation to the port of San Diego, Cal.; that thereafter said steamship sailed from the port of San Francisco, with said goods on board, bound for said port of San Diego; that said merchandise was never delivered at the port of San Diego, but was subsequently returned to the port of San Francisco in a greatly damaged condition, by reason of having been wet with sea water during said voyage, which, by reason of the negligence of said steamship company, its officers and servants, gained access to the interior of said ship, where said merchandise was stowed. The answer admits that said merchandise was damaged by reason of having been wet with sea water, and that it was not delivered at San Diego, but was returned to San Francisco, but denies that the same was so wet with sea water during said voyage, or by reason of the negligence of said steamship company, its officers and servants, or either of them, and denies that by reason of such, or any such, negligence, sea water, or any water, gained access to the interior of said ship, where said merchandise was stowed. As a further and separate defense and answer, the claimant alleges, substantially, that the said steamship was, when she sailed from the port of San Francisco, stout, staunch, strong, and in every respect seaworthy, completely manned, officered, and equipped for her then intended voyage; that she left San Francisco on April 29, 1888, at about 2 o'clock p. m., and proceeded down the bay, out through the Golden Gate, across the bar, and on her course in a southerly direction, with a fresh northwest wind blowing and a northwest chop sea; that no unusual incident was known to occur during said 29th of April, 1888; that about 1

o'clock a. m. of the 30th day of April said steamship was noticed to have a slight list to starboard; that efforts were then made to correct such list by shifting freight to port in the between-decks and burning coal mostly from the starboard bunkers; that about 2:15 or 2:30 o'clock a. m. of Monday, April 30th, water was discovered to be dropping from a point in the iron bulkhead on the starboard side of the engine room, and about six or eight inches above the deck of the alley way in the between-decks of the vessel; that examination then made resulted in water being found in the between-decks of the steamship aft, such water extending about halfway from the side of the ship to the hatch combings, but the aperture through which such water entered the vessel could not, after diligent search for the same, be discovered; that seamen were put to work passing such water down the hatches into the hold, so as to bring it within reach of the bilge pumps, and such pumps were kept in operation, notwithstanding which the water steadily increased between-decks, and the list of the vessel became so great that, about the hour of 5 o'clock a. m., it was deemed by the master of said vessel prudent to make for Port Harford with all convenient speed, which was done, and the said vessel, at about the hour of 7 o'clock a. m. of said 30th day of April, 1888, was run upon the beach at said Port Harford, at which place sea water immediately came in over her deck, and nearly filled the vessel with water, and thereby said merchandise became wet with sea water; that the beaching of said steamship was necessary to prevent and avoid a total loss of said steamship and of all the said merchandise then on board of her, and was done by the master thereof as the result of cool deliberation, and in the exercise of a wise discretion on his part as to what was best to be done, and with the purpose of saving said vessel and cargo, and of rendering entirely safe the lives of all the persons, passengers and crew, 212 in number, then on board of said steamship.

In this state of the pleadings, the following salient facts may be deemed established: (1) That the libelants' merchandise was shipped under the contracts of affreightment, or "shipping receipts," as they are termed, annexed to the libel; (2) that the merchandise was never delivered at the port of destination; (3) that it was returned to San Francisco and delivered to the shippers in a damaged condition; (4) that this damage was by reason of being wet with sea water; (5) that the fact that the vessel was leaking was discovered about 11 hours after the steamer sailed from San Francisco; (6) that the leak increased to such an extent that the vessel was compelled to put into Port Harford, and was there beached, about 17 hours after sailing from San Francisco. It may be observed, also, that there is a general denial that the merchandise was shipped in good order and condition. The following omissions in the answer are significant, in connection with the other averments and denials, and the established facts: (1) It does not appear from the answer what caused the ship to spring a leak. (2) There is no averment that the vessel, after sailing from San Francisco, and before the leak was discovered, encountered any stress of wind or

weather to which the leak could be reasonably, or at all, attributed. (3) There is no averment in the answer that the cause of the damage was from a peril of the seas, or any other unavoidable accident.

Such being the state of facts as disclosed by the pleadings, proctor for libelants contented himself with introducing the shipping receipts as evidence of the apparent good order and condition of the goods when delivered to the carrier for shipment. Bills of lading afford prima facie evidence that the merchandise was shipped in good order. Zerega v. Poppe, Abb. Adm. 397, Fed. Cas. No. 18,213; Nelson v. Woodruff, 1 Black, 156; Turner v. The Black Warrior, 1 McAll. 181, Fed. Cas. No. 14,253; The Zone, 2 Spr. 19, Fed. Cas. No. 18,220; Seller v. The Pacific, 1 Or. 409.[1] He also introduced testimony respecting the damaged state, when returned to San Francisco, of one of the shipments, and the further fact that the goods comprising that shipment realized less than they would have brought had they been returned in good order and condition. No testimony has as yet been introduced with reference to the other shipments set out in the libel, some 37 in number; the parties having probably arrived at some understanding by which the remaining claims will abide by the decision of the claim above referred to. The libelants then rested their case upon the admitted facts as stated and the supplementary proof referred to. Thereupon proctor for claimant moved for a judgment in his favor, and in support of his motion contends that the libelants have failed to show that the merchandise was damaged through the negligence of the steamship company, its officers and servants, and that they must first do this before the burden of proof is shifted on the carrier.

It is contended that the admitted and proved facts simply tend to prove one issue, viz. that the merchandise was damaged by sea water. That being so, and the presumption being, as claimed by counsel for claimant, that the vessel was seaworthy, it is urged that the further presumption arises that the damage must have been occasioned by a peril of the sea, from the consequences of which the carrier is absolved by a clause in the shipping receipt or contract of affreightment, and that therefore the burden of proof is upon the libelants first to prove affirmatively negligence on the part of the carrier before the latter is called upon to put in his defense. On the other hand, the libelants claim that they have made out a prima facie case of negligence when they show that the merchandise was shipped in apparent good order and condition, that it was never delivered, but, on the contrary, was returned to the shippers in a damaged state, and that that damage was caused by sea water, which arose while the merchandise was in the possession and under the control of the carrier on board of his vessel.

The rule of law as to the burden of proof in this class of cases is clearly and well stated by Mr. Justice Nelson in Clark v. Barnwell, 12 How. 272, as follows:

"After the damage to the goods, therefore, has been established, the burden lies upon the respondents to show that it was occasioned by one of the

[1] Fed. Cas. No. 12,644.

perils from which they were exempted by the bill of lading, and, even where evidence has been thus given, bringing the particular loss or damage within one of the dangers or accidents of the navigation, it is still competent for the shippers to show that it might have been avoided by the exercise of reasonable skill and attention on the part of the persons employed in the conveyance of the goods; for then it is not deemed to be, in the sense of the law, such a loss as will exempt the carrier from liability, but rather a loss occasioned by his negligence and inattention to his duty. Hence it is that, although the loss occurs by a peril of the sea, yet if it might have been avoided by skill and diligence at the time, the carrier is liable. But in this stage and posture of the case the burden is upon the plaintiff to establish the negligence, as the affirmative lies upon him."

In other words, the rule is that, when the merchandise has been delivered in apparent good order to the carrier, and he delivers it to the consignee at the port of destination, or, as in this case, returns the goods to the shipper, in a damaged condition, the presumption of law arises, upon proof of delivery of the goods to the carrier in apparent good condition, and proof of damage to them, that it was in consequence of the negligence of the carrier; and the burden of proof of showing that the damage arose by one of the perils of the seas excepted in the contract of affreightment, or in some manner other than through the negligence of the carrier, is then cast upon the latter, and, when he has done this, the shipper or consignee still has an opportunity to show, in rebuttal, that, although the loss or damage occurred through a peril of the sea, still it might have been avoided, had the carrier used due skill, care, and diligence. This rule appears to me just, logical, and reasonable, and is constantly followed in cases of this character. Rich v. Lambert, 12 How. 347; The Howard v. Wissman, 18 How. 231; The Niagara v. Cordes, 21 How. 29; Nelson v. Woodruff, 1 Black. 160; The Commander in Chief, 1 Wall. 51; The Maggie Hammond, 9 Wall. 459; Transportation Co. v. Downer, 11 Wall. 134; The Delaware, 14 Wall. 597; Hunt v. The Cleveland, 6 McLean, 76, Fed. Cas. No. 6,885; Lewis v. Smith, 107 Mass. 334, 338; Hooper v. Rathbone, Taney, 519, 528, Fed. Cas. No. 6,676; The Mascotte, 2 C. C. A. 399, 51 Fed. 605; Hastings v. Pepper, 11 Pick. 43; The E. M. Norton, 15 Fed. 688; The Falcon, 3 Blatchf. 64, Fed. Cas. No. 4,617; Bearse v. Ropes, 1 Spr. 331, Fed. Cas. No. 1,192; The Compta, 4 Sawy. 375, 377, Fed. Cas. No. 3,069; The Giglio v. The Britannia, 31 Fed. 432; The Lydian Monarch, 23 Fed. 298.

In the case at bar, under this rule, the presumption of negligence on the part of the carrier, growing out of the admitted facts, in connection with the proof of delivery of the merchandise to the carrier in apparent good order, and its return to the shipper in a damaged condition, relieves the libelants from any further proof of the carrier's negligence until the carrier rebuts this presumption of negligence, which the law raises against him, by proof of facts sufficient to bring the cause of damage within the perils and accidents excepted in the bill of lading.

It is, however, contended on behalf of the carrier that the presumption is that the vessel was seaworthy, and, in the absence of any affirmative proof by libelants of negligence on the part of the carrier, the mere fact that the merchandise was damaged by sea wa-

ter does not create a presumption of negligence on the part of the carrier, but rather gives rise to a presumption that such damage must have been caused by a peril of the sea. But I do not think that the mere fact that the libelants' merchandise was wet and damaged by sea water, which gained access to the ship, necessarily raises any presumption that it was occasioned by perils or accidents of the sea, or any accident at all, within the meaning of the contract of affreightment. For, if this were so, then in every case where such damage arises, the libelant would be called upon to prove a negative,—that is, that it was not the result of sea perils or of accidents,—which, it is obvious, he can rarely ever do. Indeed, it is difficult to see what part the presumption of seaworthiness of the vessel can play to prevent the burden of proof from shifting to the carrier after the libelant has made out a prima facie case of negligence. It is manifest that a mere presumption of seaworthiness, at such a stage of the case, proves, of itself, nothing; for it can well be that a vessel may be perfectly seaworthy, and yet, through some carelessness or negligence on the part of the carrier, goods laden on board may suffer damage.

But, under the admitted facts, I do not see how the carrier can be entitled to the presumption that his vessel was seaworthy. On the contrary, the facts made by the pleadings in this case seem to justify a presumption of unseaworthiness. Here is a strong, stout, staunch, and in every respect seaworthy vessel, as alleged in the answer. She is said to have been fully and completely manned, officered, and equipped for her then intended voyage. She was engaged in the coasting trade, and carried, on the particular voyage in question, 212 persons, passengers and crew, besides her cargo. She meets with no unusual or boisterous weather. She encounters no storms or other perils of the sea. After being out at sea only 11 hours, a slight list to starboard is observed. Efforts are immediately made to correct this list. Shortly after, water is discovered to be dropping from a point in the iron bulkhead on the starboard side of the engine room, and about six or eight inches above the deck of the alley way in the between-decks of the vessel. Careful examination being made, water is found in the between-decks of the steamship aft, such water extending about halfway from the side of the ship to the hatch combings; but the place of the leak could not be ascertained. The pumps are employed, but, notwithstanding, the water gains steadily in the between-decks, and the list of the vessel becomes so great that, at about 5 o'clock a. m. of the 30th of April, or some four hours subsequent to discovering the list of the vessel, it was deemed prudent by the master to make for Port Harford with all convenient speed, and two hours thereafter, or about 7 o'clock, the steamship is run upon the beach at Port Harford to prevent her from foundering and becoming a total loss, and to render entirely safe the lives of all the passengers and crew. These facts appear from the allegations of the answer itself, and, if they are not inconsistent with the presumption of seaworthiness of the steamship, and strongly indicative of unseaworthiness, they at least, in my opinion, are of sufficient weight to throw the burden of proof

upon the carrier to show wherein and how the leak arose. A presumption of unseaworthiness has been predicated upon much less convincing facts than those adduced in the case at bar. In Work v. Leathers, 97 U. S. 379, the general proposition is laid down that, "if a defect without any apparent cause be developed, it is to be presumed it existed when the service began." See, also, Talcot v. Insurance Co., 2 Johns. 122, 129.

In Cort v. Insurance Co., 2 Wash. C. C. 375, Fed. Cas. No. 3,257, Mr. Circuit Justice Washington, in charging a jury in an action upon a policy of insurance on the schooner Triumph, said:

"If a vessel, after she commences her voyage, becomes unfit to prosecute it, and has been exposed to no extraordinary perils of the sea, this circumstance may raise so strong a presumption of her having been unseaworthy at the time of her departure as to call upon the insured to give strong evidence to repel the presumption."

In The Planter, 2 Woods, 490, Fed. Cas. No. 11,207a, this significant language was employed:

"Without having encountered any tempestuous weather, she suddenly sprung a leak within less than twenty hours after leaving port, so that her officers were compelled, in order to save her from sinking, to throw over more than one-third of her cargo. These facts raise the presumption that she was unseaworthy when she started, and throw on claimants the burden of proof to show that she was seaworthy."

In 2 Pars. Mar. Law, 138, 139, the general rule in this respect is thus stated:

"If the vessel springs a leak soon after sailing, without having met with any peril, this raises a presumption that she was unseaworthy when she sailed."

And in 1 Arn. Ins. (Am. Ed.) 689–691, that author says:

"Where a ship becomes so leaky or disabled as to be unable to proceed on her voyage soon after sailing on it, and this cannot be ascribed to any violent storm or extraordinary perils of the seas, the fair and natural presumption is that it arose from causes existing before her setting out on her voyage, and, consequently, that she was not seaworthy when she sailed."

See, to the same effect, the following authorities: Walsh v. Insurance Co., 32 N. Y. 427, 436; Paddock v. Insurance Co., 11 Pick. 227, 237; Patrick v. Hallett, 3 Johns. Cas. 76; Higgie v. American Lloyds, 14 Fed. 143; The Gulnare, 42 Fed. 861; and Marsh. Ins. 367.

I am of the opinion that, while the libelants are very close to the border line which would entitle the carrier to a judgment in his favor on the ground that the libelants have failed to make out a prima facie case, still that they have, in connection with the admitted facts, established sufficient to throw the burden of proof upon the carrier. The motion for judgment in favor of claimant is therefore denied, on each and every ground alleged.